NOT FOR PUBLICATION

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**RAYMOND COREY GREEN,**

        **Plaintiff,**

**-vs-**                                                    **Case No. 6:12-cv-357-Orl-28KRS**

**COMMISSIONER OF SOCIAL SECURITY,**

        **Defendant.**

_____

## Report and Recommendation

**TO THE UNITED STATES DISTRICT COURT:**

This cause came on for consideration without oral argument on the Complaint filed by Raymond Corey Green seeking review of the final decision of the Commissioner of Social Security denying his claim for social security benefits, Doc. No. 1, the answer and certified copy of the record before the Social Security Administration ("SSA"), Doc. Nos. 11, 12, and the parties' memoranda, Doc. Nos. 15, 16. This matter has been referred to the undersigned for issuance of a report and recommendation.

**I.      PROCEDURAL HISTORY.**

In 2007, Green filed applications for benefits under the Federal Old-Age, Survivors and Disability Insurance Programs ("OASDI"), 42 U.S.C. § 401 *et seq.*, and under the Supplemental Security Income for the Aged, Blind and Disabled Program ("SSI"), 42 U.S.C. § 1381, *et seq.* (sometimes referred to herein as the "Act"). He alleged that he became disabled on June 30, 2005. R. 160, 165.

NOT FOR PUBLICATION

After his applications were denied initially and on reconsideration, an administrative law judge ("ALJ") held a hearing at Green's request. Green, represented by an attorney, and a vocational expert ("VE") testified at the hearing. R. 34-78.

After considering the testimony and the medical evidence presented, the ALJ determined that Green was insured under OASDI through December 31, 2010. R. 16. The ALJ found that Green had not engaged in substantial gainful activity since the alleged disability onset date. R. 18.

The ALJ concluded that Green had neck pain and a schizoaffective disorder, which were severe impairments. R. 18. Green's mental impairment caused mild restrictions in activities of daily living, moderate difficulties in social functioning and concentration, persistence or pace, but no episodes of decompensation. R. 19. The ALJ found that Green's condition did not meet or equal any listed impairment. R. 18.

The ALJ found that Green had the residual functional capacity ("RFC") to do the following:

> [T[he claimant is able to do the full range of medium work exertionally. However, he is limited to jobs involving simple, routine, repetitive tasks involving up to three step commands. He may have occasional changes in the work setting and judgment or decision making and occasional interaction with the general public and coworkers.

R. 20. In making this assessment, the ALJ gave great weight to the opinions of Carlos Sanchez, M.D., Angeles Alvarez-Mullin, M.D., Janet Attlesey, M.D., and Malcolm Graham, III, Ph.D. The ALJ gave some weight to the opinions of Jeff Oatley, Ph.D. and nurse

practitioner Maryann Darhu. The ALJ gave little weight to the opinion of William Friedenberg, Ph.D. R. 24-26.

The ALJ concluded that Green could not return to his past relevant work. R. 26. After considering testimony from a VE, the ALJ found that there was work available in the national economy that Green could perform. R. 27-28. Therefore, the ALJ concluded that Green was not disabled. R. 28.

Green sought review of the ALJ's decision by the Appeals Council and submitted additional evidence. R. 5, 9. On January 11, 2011, the Appeals Council issued a decision after review of the new evidence finding no basis to change the ALJ's decision. R. 1-4.

Green seeks review of the Commisioner's decision by this Court.

## II.     JURISDICTION AND STANDARD OF REVIEW.

Green having exhausted his administrative remedies, the Court has jurisdiction to review the decision of the Commissioner pursuant to 42 U.S.C. § 405(g), as adopted by reference in 42 U.S.C. § 1383(c)(3). A court's review of a final decision by the SSA is limited to determining whether the ALJ's factual findings are supported by substantial evidence, *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (per curiam), and whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

## III.    STATEMENT OF FACTS.

After thorough review of the record, I find that the facts in the record are adequately stated in the ALJ's decision and in the parties' memoranda. Therefore, I will only summarize the pertinent facts to protect Green's privacy to the extent possible.

Green was born in 1969. R. 45. He completed high school. R. 47. He previously worked as a laborer/driver with waste management companies. R. 48-49, 51. He received unemployment compensation for six months after he stopped working. R. 52-53.

Green was injured on the job by a drunk driver in 2005. R. 51, 65. He was subsequently injured in an automobile accident in November 2009. R. 65-66, 427.

An MRI taken of the cervical spine in April 2005 revealed disc dessication but no herniation. R. 269-70.

In July 2006, Green was examined by someone at Ormond Medical Arts -- Family Practice at the request of the SSA. He complained of chronic pain throughout his body, primarily at his upper extremities, neck and low back. An MRI of his left shoulder taken in April 2006 (R. 273) showed rotator cuff tendonitis with no evidence of tear. Green also complained of psychiatric issues. R. 264. Examination of the spine showed mild generalized tenderness throughout. R. 265. Green's range of motion was normal. R. 266-67.

Beginning in August 2007, Green was treated by Teresa Hernandez, M.D., a family practice doctor. R. 282. Green complained of emotional instability (lability), loss of interest in daily activities (anhedonia) and difficulty sleeping with diffuse arthralgias. R. 284. Dr. Hernandez prescribed medication. *See* R. 291.

Albert Gillespy, M.D., an orthopaedist, examined Green in November 2007. Green complained of neck and low back pain with difficulty turning his head from side to side and headaches off and on. He also had back spasms with constant numbness in his legs and difficulty sleeping due to pain. R. 291. Upon examination, Dr. Gillespy noted tenderness but

no spasms. X-rays of the cervical and lumbar spine were negative. Dr. Gillespy's impression was neck pain, lumbago and probable major depressive disorder. R. 293.

Dr. Gillespy examined Green again in December 2007. Green's complaints were largely the same. Dr. Gillespy noted that an MRI scan of the cervical spine showed minimal degenerative disc disease and osteoarthritis with no herniated discs. R. 297.

On December 21, 2007, Green underwent a psychological screening at ACT Corporation. He complained of suicidal ideation with pain and making bizarre statements. R. 299. The treatment provider wrote that Green was difficult to follow and made odd statements. Green did not remain for treatment. *Id.*

On January 7, 2008, Dr. Friedenberg examined Green. He noted that Green reported having visual hallucinations/premonitions and paranoid thoughts. His speech was disjointed and tangential and his thinking was confused. Dr. Friedenberg's assessment was depressive disorder NOS with a note to rule out psychosis NOS. R. 303-04, 453. In March 2008, Dr. Friedenberg prepared a Treating Source Mental Health Report. He indicated that he had last treated Green in January 2008. R. 313. Dr. Friedenberg described Green's mood as depressed and his affect as volatile. His thought processes were disjointed and tangential, he was agitated, and he had hallucinations and paranoid delusions. His concentration was poor to fair. R. 312-13. Dr. Friedenberg's assessment was that Green suffered from a depressive disorder and a psychotic disorder not otherwise specified. R. 313.[1] Dr. Friedenberg wrote that Green was not capable of sustaining work activity for eight hours a day, five days a week. *Id.*

---

[1] Dr. Friedenberg's report cites diagnosis codes from the *Diagnostic and Statistical Manual of Mental Disorders* ("DSM-IV").

NOT FOR PUBLICATION

Meanwhile, on February 15, 2008, Stephen Oh, M.D., a psychiatrist, examined Green. Green reported stiffness and pain in his neck and shoulder since 2005. He complained of stress and depression with difficulty sleeping and reported that he was temperamental, with little energy or motivation. R. 306, 309. Dr. Oh wrote, "While discussing his problems and treatment plan, [Green] became argumentative and agitated. He didn't want to listen. He was asked to leave my office due to his argumentative agitated behaviors. He was cursing, banged door and left." R. 311. Dr. Oh did not make any diagnostic assessment of Green's condition.

Carlos M. Sanchez, M.D., examined Green on March 28, 2008 at the request of the SSA. Green complained of neck problems, including difficulty turning his neck left and right. Green otherwise indicated that he was doing well. MRIs from December 2007 showed minimal disk bulges at C4-C5, C5-C6. R. 317. Upon examination, Dr. Sanchez noted mild loss of range of motion in the neck and no tenderness on palpation along Green's spine. R. 318, 320. His impression was cervical neck pain. R. 319.

On April 8, 2008, J. Jeff Oatley, Ph.D., examined Green at the request of the SSA. Green reported being worried and angry. Dr. Oatley observed that Green's affect was flat. Psychological tests disclosed significant concentration deficits and impaired memory due to thought process problems. R. 326. Green seemed mildly confused but was cooperative and his attitude was pleasant. Green reported having two friends, attending church and enjoying his new puppy. R. 327. Dr. Oatley's assessment was that Green suffered from a psychotic disorder not otherwise specified. He noted that Green did not persist with any tasks. *Id.*

On April 10, 2008, Angeles Alvarez-Mullin, M.D., prepared a Psychiatric Review Technique Form ("PRTF") after review of Green's records. Dr. Alvarez-Mullin opined that Green would have mild limitations in activities of daily living and moderate limitations in social functioning and maintaining concentration, persistence and pace with no episodes of decompensation. R. 338. He also prepared a Mental Residual Functional Capacity Assessment. In this document, Dr. Alvarez-Mullin indicated that Green would be moderately limited in the ability to do the following: understand, remember and carry out detailed instructions; maintain attention and concentration for extended periods; complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; and set realistic goals or make plans independently of others. R. 342-43. He wrote in the functional capacity assessment portion of the form as follows:

> Cl appears capable of carrying out simple tasks in a low stress work situation. Seems able to maintain a work routine independently. Able to make simple work related decisions. Able to relate to the public and co workers on a limited basis . . . . Would probably interact appropriately with supervisors if approached in a sup[p]ortive-nonconfrontational manner.

R. 344.

In May 2008, Youssef W. Guergues, M.D., a pain management physician, examined Green. Green complained of constant neck pain radiating to his left shoulder, arm and hand with tingling and numbness over his left arm. He also reported headaches and depression. Dr. Guergues noted that an MRI showed disc bulges at C4-C5 and C5-C6, and an MRI of the left shoulder showed tendinitis. Upon examination, Dr. Guergues observed mild

tenderness in the cervical spine with 50% limitation in range of motion. R. 381. He also observed mild tenderness in both shoulders. His assessment was neck pain, cervical radiculopathy, disc bulge and tendinitis. He administered epidural steroid injections. R. 382-84. The first injection provided good relief for about five days. R. 384. Subsequent injections provided about 50% pain relief. R. 385-86. On August 6, 2008, Green reported "satisfactory pain control" and that he was more functional. Dr. Guergues prescribed Lortab for pain. R. 387.

In September 2008, Green told Dr. Guergues that he was having low back pain. Upon examination, Dr. Guergues observed mild tenderness in the lower back with no limitation in range of motion. His impression was low back pain and lumbar radiculopathy. R. 388. As of October 1, 2008, Green reported "satisfactory pain control." R. 389. However, on October 29, 2008, Green complained of lower back pain. Dr. Guergues administered epidural steroid injections. R. 390-96. Green reported 50% to 65% pain relief from the injections. R. 393, 395, 397.

In early 2009, Green told Dr. Guergues that he had "satisfactory pain control" using Lortab and Soma. R. 398-400. He reported neck pain again in May 2009. R. 407. Green received more epidural steroid injections in July and September 2009 due to neck pain. R. 401, 403, 405-06.

On July 15, 2008, Janet Attlesey, M.D., prepared a Physical Residual Functional Capacity Assessment based on a review of Green's records. Dr. Attlesey opined that Green could lift 25 pounds frequently and 50 pounds occasionally. He could sit, stand or walk about 6 hours in an 8-hour workday. R. 355.

On July 16, 2008, Walter Shepherd, Ph.D., prepared a PRTF and mental RFC form after review of Green's records.[2] He concurred with Dr. Alvarez-Mullin with the exception that he found that Green would also be moderately limited in the ability to respond appropriately to changes in the work setting. R. 377. In the functional capacity assessment portion of the mental RFC form, Dr. Shepherd wrote as follows:

> A    Cl is able to understand and remember simple directions, but will have difficulty w more complex ones.
>
> B    [C]l is able to carry out simple instructions and engage in routine, repeti[ti]ve tasks, but will have difficulty w tasks requiring sustained focus and complex mental demands.
>
> C    Cl is able to interact appropriately on a limited basis, but may have problems w [intense] or prolonged social contact. He would do best in a supportive work situation that is non confrontational.
>
> D    Cl will function best when work demands are routine, and will have difficulties in situations where the stress is high or the demands are great.

R. 378.

On December 9, 2009, Malcolm J. Graham, III, Ph.D., evaluated Green, including administering the Wechsler Adult Intelligence Scale-III ("WAIS-III") and the Minnesota Multiphasic Personality Inventory-II ("MMPI-II") tests. Dr. Graham observed that Green did not have a depressed or anxious mood and his affect was appropriate. His thought processes were slow, which Dr. Graham attributed to Green being "very suspicious" and other unknown variables. R. 409. Dr. Graham observed that Green was slow to respond to attention and concentration tasks, and he found Green's motivation on the tasks to be "very

---

[2] Although Dr. Shepherd did not indicate his specialty on the PRTF and mental RFC forms, the record reflects that he is a psychologist. R. 239.

questionable." R. 411-12. As a result, Dr. Graham found the test results to be invalid in many respects and consistent with persons "either in a psychiatric setting or [who] are exaggerating their symptoms." R. 413; *see also* R. 414.

Among other things, Green acknowledged experiencing homicidal ideation toward persons who he believed were falsifying information. R. 409. He was very sensitive to any form of criticism. R. 414. Green reported alienating himself from others. R. 415. He took prescribed medication "'every now and then.'" R. 410. Dr. Graham's diagnosis was a delusional disorder, personality disorder NOS with borderline, avoidant, paranoid and schizo-typal features with a notation to rule out malingering. R. 415. He also found it highly probable that Green had borderline intellectual functioning. He assessed Green's global assessment of functioning ("GAF") at 65 to 75. R. 416.

Lori Christianson, L.M.H.C., at Coastal Mental Health Center, prepared a bio-psychosocial assessment of Green on January 5, 2010. Her provisional diagnosis was an adjustment disorder with depressed mood with a note to rule out a mood disorder NOS. She recommended a psychiatric evaluation and therapy. R. 426. On January 7, 2010, Jenaro Fernandez, M.D., examined Green. He indicated that Green's attention, concentration, memory, judgment, intellectual function and impulse control were good and found that Green had a current GAF score of 60 with a GAF score of 65 the previous year. R. 421. Nevertheless, Dr. Fernandez wrote that Green was "medically disabled - unable to work." *Id.* His diagnoses were depression and emotional problems with chronic pain. He prescribed Paxil, Risperdal for paranoia and Seroquel and Trazolam for sleep. *Id.*[3]

---

[3] During the ALJ's hearing, Green testified that he saw Dr. Fernandez every month and had counseling at his office twice a month. R. 57. Based on this testimony, the records of Dr. Fernandez's treatment of Green that are before the Court appear to be incomplete.

Following an automobile accident in November 2009, Green was treated by Edwin Ruby, D.C., a chiropractor, for complaints of chronic neck and back pain and headaches. R. 439-51. On December 24, 2009, Green was argumentative and angry because he was not getting better. R. 441.

MRIs taken in January 2010 were unremarkable for the thoracic spine but showed right-sided protrusion of a disc at L5-S1 and C5-C6 and disc bulges at C4-C5 and C6-C7. R. 432-38. The protrusion at L5-S1 abutted the right nerve root. R. 435.

On February 8, 2010, Dr. Guergues discharged Green from his practice due to Green's violation of his "narcotic contract." R. 431.

In March 2010, Sanjay Trivedi, M.D., a pain management physician, treated Green. Green complained of neck and back pain radiating to both heels. Dr. Trivedi observed that Green's gait was normal. Upon examination, Dr. Trivedi identified paraspinal tenderness with decreased range of motion. Rotation, lateral bending and a straight-leg raising test ("SLR") were also positive for pain. R. 427. Green's muscle power was normal. MRIs revealed disc bulges or protrusions at C4-5, C5-6 and L5-S1 and a disc bulge at C6-7. R. 428; *see also* R. 432-38. Dr. Trivedi's impressions included cervical, thoracic and lumbar strain syndrome, cervicalgia and cervical facet syndrome, and myofascial pain syndrome with symptomatic trigger points in the thoracic area. He recommended cervical facet blocks and trigger point injections in the thoracic area. R. 428. Dr. Trivedi refilled Green's Lortab prescription. R. 429.

On March 17, 2010, D. Mark Murphy, M.D., a neurosurgeon, examined Green. Green complained of constant lumbosacral pain radiating to his legs. R. 467. Green also reported generally good health, memory loss, nervousness, depression and insomnia. Dr. Murphy

observed that Green was pleasant and polite. Dr. Murphy found that Green suffered from myofascial lumbago with some disc protrusion which should improve over time. Dr. Murphy indicated that Green did not need surgery on the lumbar spine and likely would never need such surgery. R. 468. He indicated that "bending, twisting and heavy lifting should be avoided." R. 469.

On April 15, 2010, nurse practitioner Darhu, who worked with Dr. Fernandez, prepared a mental RFC form. *See* R. 69. Darhu opined that Green would be markedly limited in the ability to do the following: remember locations and work-like procedures; carry out detailed instructions; work in coordination with or proximity to others without being distracted by them; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; respond appropriately to changes in the work setting; travel in unfamiliar places or use public transportation; and set realistic goals or make plans independently of others. R. 455-56. She opined that Green would be moderately limited in the ability to do the following: understand and remember detailed and short and simple instructions; maintain attention and concentration for extended periods; sustain an ordinary routine without special supervision; make simple work-related decisions; complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; and be aware of normal hazards and take appropriate precautions. *Id.* In support of these opinions, Darhu wrote as follows:

> This client has difficulty with expression of feelings and actions in appropriate manner. Client avoids contact with others as much as possible [due] to paranoias and hopelessness and uselessness. Overwhelmed with family responsibilities. Avoids contact with others as much as possible. Difficulty following instructions if anymore than basic.

R. 457.

During the ALJ's hearing, Green testified that medications made him clumsy and caused fatigue. He could not sit in bright light without his eyes tearing. R. 54-55. He also had mood swings. R. 55. Injections in his neck relieved his neck pain temporarily. R. 55. He had lower back pain at a level of 8 to 9 on a 10-point scale despite taking pain medication. R. 67. He also had a shoulder problem. R. 66. Green estimated that he could walk around a block, stand for about 30 minutes, lift about 15 pounds and sit about 30 minutes. R. 58. During a normal day he got his children off to school and drove his wife to church. After returning home, he would watch some television and go outside for a walk. R. 60-61.

Green indicated that he had hallucinations from time to time despite taking his medication as prescribed. R. 63-64. He had good days and bad days. On bad days he was very moody. R. 66. He avoided people. R. 67. Pain interfered with his ability to think and concentrate. R. 68. He also reported a problem with memory. R. 68.

At the conclusion of Green's testimony, the ALJ asked the VE to assume the following hypothetical person:

> Please assume a hypothetical individual the claimant's age, education and vocational background. This person is capable of the full range of medium work. However, would have the following non-exertional limitations. Would need to be limited to jobs involving simple, routine, repetitive tasks with up to three-step commands, with only occasional changes in the work setting

> and only occasional judgment or decision-making, with only occasional interaction with the general public and only occasional interaction with co-workers.

R. 72.

The VE testified that this hypothetical person could not return to any of Green's past relevant work. *Id.* The VE further testified that this hypothetical person could perform the jobs of kitchen helper (medium, unskilled work), office helper (light, unskilled work), mail clerk (light, unskilled work), and surveillance system monitor (sedentary, unskilled work). R. 73. Green's attorney asked the VE whether the hypothetical person could perform these jobs if he had marked limitations in concentration, persistence and pace, which the attorney defined as the person being unable to concentrate, persist and perform at an adequate work pace 30% of the time. R. 75. The VE said that a person with this limitation would not be able to perform work available in the national economy. *Id.* The VE further testified that if the marked limitations found by nurse practitioner Darhu were credited, the person also could not perform any jobs available in the national economy. R. 76.

**IV. ANALYSIS.**

Green contends that the ALJ did not adequately consider and incorporate the opinions of Dr. Friedenburg, Dr. Alvarez-Mullin, and nurse practitioner Darhu in the RFC assessment. He asserts that the hypothetical question to the VE was inadequate because it did not include all of Green's functional limitations. Finally, Green argues that the ALJ erred in failing to assign functional limitations arising from his shoulder impairment. These are the only issues I will address.[4]

---

[4] The parties were cautioned in the scheduling order that issues not specifically raised would be considered to have been waived. Doc. No. 14 at 2.

NOT FOR PUBLICATION

### A. Treatment of Medical Opinions.

#### 1. Dr. Friedenberg.

The law in this circuit requires an ALJ to give significant weight to the opinion of a treating doctor unless good cause is shown to the contrary. *See Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997). Dr. Friedenburg was one of Green's treating physicians, although the record reflects that he saw Green only twice. The ALJ stated that little weight was given to Dr. Friedenberg's opinion that Green was not capable of sustaining work activity for eight hours a day five days a week because this opinion conflicted with the greater weight of the evidence. In support of this finding, the ALJ cited only to the records of Dr. Guergues and Dr. Ruby who, the ALJ wrote, did not record "any psychotic or bizarre behavior." R. 24.

The ALJ's finding that Dr. Friedenburg's opinion is contrary to the greater weight of the evidence is not supported by the record. In 2007, the intake person at ACT Corporation wrote that Green made odd statements. R. 299. Dr. Oh recorded in February 2008 that Green became argumentative and agitated, cursed and banged the door as he left Dr. Oh's office. R. 311. Dr. Ruby also indicated in 2009 that Green was argumentative and angry. R. 441. Dr. Oatley found that Green had a psychotic disorder, and Dr. Graham found that Green had a delusional disorder. R. 327, 415. All of these records support Dr. Friedenburg's opinion that Green could not perform full-time work due to his psychotic disorder. Accordingly, the ALJ erred by failing to articulate good cause supported by substantial evidence in the record for failing to give Dr. Friedenburg's opinion significant weight.

NOT FOR PUBLICATION

2. Dr. Alvarez-Mullin and Nurse Practitioner Darhu.

Dr. Alvarez-Mullin prepared a mental RFC assessment after reviewing Green's records. His findings are considered opinion evidence that can be relied upon by the ALJ. *See, e.g.,* 20 C.F.R. § 404.1527(e)(2). Nurse practitioner Darhu prepared a mental RFC assessment based on treatment of Green in her practice. While a nurse practitioner is not "an acceptable medical source" under the SSA regulations, evidence from a nurse practitioner is evidence from "other sources" that may be considered in determining the functional limitations arising from Green's impairments. *See Turner v. Astrue*, No. 07-00194-CB-B, 2008 WL 4489933, at * 1, 13 (S.D. Ala. Sept. 30, 2008).

Consistently with the opinion of Dr. Friedenberg, Dr. Alvarez-Mullin and Darhu each checked boxes on the mental RFC forms indicating that Green would be moderately limited in the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods. R. 342-43, 455-56. In the functional capacity section of the forms, however, neither of these professionals specifically addressed this limitation. However, Dr. Alvarez-Mullin wrote that Green "appears capable of carrying out simple tasks in a *low stress work situation,*" which could be interpreted as a functional limitation necessary to minimize interruptions from psychologically based symptoms. R. 344 (emphasis added).

While the ALJ gave significant weight to Dr. Alvarez-Mullin's opinion (specifically citing the limitation to work in a low stress work situation), R. 25, he did not include the limitation to work in a low stress work situation in the RFC or in the hypothetical question to

the VE. The ALJ also did not explain how the limitation to work in a low stress work situation was otherwise incorporated into the RFC.

Because the ALJ provided an inadequate basis for determining whether the RFC adequately accommodated the functional capacity assessment made by Dr. Alvarez-Mullin, to which the ALJ gave significant weight, the record is insufficient to determine whether the failure to limit Green to work in a low stress work situation is based on substantial evidence and proper application of the law. *See, e.g., Cusimano v. Astrue*, No. 8:10-cv-2200-T-TGW, 2011 WL 3796746, at * 2-4 (M.D. Fla. Aug. 26, 2011). When, as here, the ALJ fails to sufficiently explain how he reached his decision, the Court may not speculate. *See Owens v. Heckler*, 748 F.2d 1511, 1516 (11th Cir. 1984); *Monte v. Astrue*, No. 5:08-cv-101-Oc-GRJ, 2009 WL 210720, at * 5-7 (M.D. Fla. Jan. 28, 2009).

  B. *Hypothetical Question to the VE.*

"'In order for a vocational expert's testimony to constitute substantial evidence, the ALJ must post a hypothetical question which comprises all of the claimant's impairments.'" *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1180 (11th Cir. 2011)(quoting *Wilson v. Barnhart*, 284 F.3d 1219, 1227 (11th Cir. 2002)(per curiam)). As discussed above, it is not evident how the ALJ accounted for Green's limitation in the ability to work a normal workday and workweek without interruption by psychologically based symptoms in the RFC. The ALJ did not specifically include this limitation in the hypothetical question to the VE, and he did not include Dr. Alvarez-Mullin's finding that Green could work only in a low stress work situation in the hypothetical question to the VE.

Green also argues that the ALJ omitted other functional limitations from the hypothetical question, including limitations arising from his neck pain and shoulder injury and

NOT FOR PUBLICATION

limitations on concentration, persistence and pace and social interaction with others. As the Eleventh Circuit explained in *Winschel*, an ALJ must pose a hypothetical question that accounts for all of the functional limitations the ALJ found to exist, and he must do so either explicitly or the questions must "implicitly account for these limitations." 631 F.3d at 1180-81. Because the ALJ did not explicitly include all of Green's nonexertional limitations in the RFC and did not explain how he implicitly accounted for those limitations in the RFC, reversal is required. *Id.* at 1181.

      C.    *Further Proceedings.*

Green asks that the Court remand the case for an award of benefits. The Court may remand a case for an award of disability benefits when the Commissioner "has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt." *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993). In the present case, the Commissioner has not yet properly explained his consideration of the evidence, and there has been no finding whether there would be work Green could perform based on an RFC and hypothetical question to a VE accounting for all of Green's functional limitations. Therefore, remand for further proceedings is required.

On remand, the Commissioner should require the ALJ to account for all of Green's functional limitations explicitly in the RFC and questions to the VE or explain why each limitation is implicitly included in the RFC and the hypothetical questions to a VE. *See Winschel*, 631 F.3d at 1181. The ALJ should also address the exertional and nonexertional limitations arising from all of Green's impairments, including neck pain and his shoulder impairment**.**

## V.    RECOMMENDATION.

For the reasons set forth herein, it is **RESPECTFULLY RECOMMENDED** that the decision of the Commissioner be **REVERSED** pursuant to sentence four of 42 U.S.C. § 405(g) and the case be **REMANDED** to the Commissioner for further proceedings. I further **RECOMMEND** that the Court direct the Clerk of Court to issue a judgment consistent with its Order and, thereafter, to close the file.

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

**RECOMMENDED** this 23rd day of January 2013.

*Karla R. Spaulding*
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE